UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

JOHN BOATFIELD,                      )
                                     )
    *Petitioner,*                    )
                                     )
v.                                   )   No.    1:07-cv-26
                                     )   *Chief Judge Curtis L. Collier*
JAMES A. BOWLEN, WARDEN              )
                                     )
    *Respondent.*                    )

## MEMORANDUM

John Boatfield ("Boatfield) has filed a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 raising two claims for review (Court File No. 1). Boatfield seeks review of his 2000

state convictions for one count of first degree murder and one count of abuse of a corpse. The

Respondent has filed a motion for judgment as a matter of law (Court File No. 9). After reviewing

the record and the applicable law, the Court concludes that Boatfield's § 2254 petition will be

**DISMISSED.**

## I.    Standard of Review

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in

custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties

of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254

Proceedings in the United States Districts Courts, the Court is to determine, after a review of the

response, the transcript, record of state court proceedings, and the expanded record, whether an

evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the

case

as justice dictates. After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute generally limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

A state court's determination of a factual issue shall be presumed to be correct and the presumption of correctness can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990).

## II.    Procedural Background

On May 3, 2000, a Hamilton County jury convicted Boatfield of first degree murder and abuse of a corpse. Boatfield was sentenced to a life term of imprisonment plus two years to be served concurrently. Boatfield appealed his conviction contending the trial court erred in not

enforcing the plea agreement; the evidence was insufficient to support the verdicts; hearsay evidence of the victim's statements was erroneously admitted; evidence obtained via wiretaps was erroneously admitted; evidence regarding an alleged extra-marital affair was erroneously admitted; and the trial court should have charged the jury regarding alibi.

The Court of Criminal Appeals of Tennessee affirmed the convictions on June 3, 2002. Boatfield's Application for Permission to Appeal in the Tennessee Supreme Court was denied on June 3, 2002.

Boatfield filed a petition in state court for post-conviction relief claiming counsel was ineffective and that his constitutional rights to due process were violated when the State withdrew its plea agreement. Upon dismissal by the trial court, Boatfield sought review in the Court of Criminal Appeals of Tennessee. The appellate court affirmed the judgment of the trial court. The Tennessee Supreme Court denied Boatfield's application for permission to appeal on November 13, 2006. Boatfield, by and through counsel, filed this petition for habeas corpus relief on January 29, 2007.

## IV.    Factual Background

The facts underlying the convictions at issue in this case are taken from the opinion of the Court of Criminal Appeals of Tennessee on direct appeal:

> On March 12, 1998, firemen responded to a fire at the home of the defendant and discovered the defendant's wife, Emily Denise "Nicy" Boatfield, dead in her bed with bedclothes piled over her. A fire had been set beneath the bed using gasoline. Kitchen matches, a .22 caliber shell casing, and the defendant's .22 caliber rifle were in the charred debris. The rifle was cocked with a round in the firing chamber. Arson investigator Alec Conner opined that the fire was typical of a fire set to conceal a crime. The fire was confined to the master bedroom.
>
> The victim was shot in the head and stabbed twice in the abdomen. Her right leg and

foot were burned and charred black. Dr. Frank King, Hamilton County medical examiner, testified the victim was first shot and then stabbed. According to Dr. King, the gunshot killed her within seconds; she was then stabbed as she died or soon thereafter; and she died before the fire started. He said the victim's right hand was not injured, nor did she have any defensive wounds. He estimated she died between 8:00 a.m. and 10:00 a.m.

Dr. King opined she was probably shot in bed, and it was highly improbable she was shot elsewhere and moved to the bed. Thick blood and tissue were around the pillow on the bed. He testified blood found elsewhere in the master bedroom and hall was disbursed from the bed after the victim's death, probably by the firemen. No foreign genetic material was found underneath the victim's fingernails. Forensic tests revealed the shell casing found was fired from the defendant's rifle. Dr. King stated the victim's stab wounds were consistent with the use of a single-edge knife blade.

The home showed signs of an apparent burglary. In the living room, the gun cabinet was opened by force, and a container of .22 caliber bullets, bearing the defendant's fingerprints, was spilled on the floor. A tire tool was found in the floor. Tommy McMillin, the defendant's son-in-law, identified the tire tool as one he had been using to repair a car in the Boatfields' backyard the day before the murder. McMillin said he left the tool in the backyard by an outbuilding.

Both the master bedroom and the bedroom belonging to the Boatfields' teenage daughter were ransacked. Jewelry boxes were open and their contents strewn. The back door, which had an ADT Security sticker on the window, appeared to have been forced open using the tire tool.

When officers arrived at the crime scene, they found televisions and a stereo in the home. Three guns were in the gun cabinet. The victim's jewelry, including diamond rings, a watch, necklace and earrings, were still on her body. A purse, pager, cellular telephone and keys were on the kitchen table. The defendant told insurance investigator Danny Walker that jewelry, silver bars, money and old coins were taken. He told Walker and the police that no guns were missing. He also told the police he had loaded the .22 caliber rifle to shoot at dogs, and it possibly had five rounds in it.

Officer Rick Phillips, who lived in the neighborhood, testified it was a safe neighborhood and 20 to 30 officers resided within four miles of the Boatfield home. The neighborhood is a high traffic area with homes adjacent to the Boatfield home located only 75 to 100 feet away. One belonged to Dee Newell, who kept three dogs in a fence close to the Boatfields' driveway. Officer Phillips and Inspector Michael Mathis testified that Newell's dogs barked most of the time they were present at the crime scene. Newell testified one of her dogs barked at strangers, but on the morning of the murder, she did not hear the dogs bark until the fire trucks arrived.

4

There was a sign in the front yard of the Boatfield home indicating it was monitored by ADT Security. The house and all of the yard are visible from the road. Two of the Boatfields' vehicles, the defendant's red truck and a Saturn, were parked in the driveway. The Boatfields' dog, a Chihuahua named Chico, would bark when someone entered the home and was protective of the victim. The defendant told insurance investigator Walker, his father-in-law Ray Smith, and the police that Chico was in the house. After the murder, Chico was found unharmed outside the house.

On the morning of the murder, the defendant and Candace Boatfield, the teenage daughter of the defendant and the victim, left home in the victim's new purple truck just before 7:00 a.m. They made a brief stop at the defendant's business, Nursery Brokers, and arrived at a restaurant for breakfast by 7:00 a.m. The defendant told Detective Charles Dudley that his wife was asleep when they left. Candace Boatfield testified they remained at the restaurant for an hour or less. Then the defendant took her to school, where they arrived at approximately 8:05 or 8:10 a.m. During the drive to school, the defendant told his daughter he was going to wash the truck, pick up parts for his dune buggy and go to work.

The defendant told Detective Dudley he returned home, where his wife was awake and watching television. He said she asked him to spend the day with her, but he declined because he had work to do. The defendant said he told her he would wash her truck. He also called his brother at Nursery Brokers.

According to telephone company records, a one minute phone call was placed from the Boatfield residence to Nursery Brokers at 8:57 a .m. Tommy McMillin testified the defendant called Nursery Brokers between 9:00 and 9:05 a.m. and then arrived at the business 15 to 20 minutes later. The defendant told Detective Dudley he left home some time after 9:00 a.m. In a recorded interview with insurance investigator Walker, the defendant said his wife was watching television when he left the house at 9:15. After the defendant arrived at Nursery Brokers, he left in the purple truck, stating he was going to wash the truck and pick up parts.

ADT Security Services received a fire alarm call from the Boatfield residence at 9:22 a.m. At 9:27 a.m., ADT called the defendant's business and a man stated the defendant was not there. McMillin testified he answered the telephone when ADT called and told them the defendant would return in 30 minutes.

The defendant told Detective Dudley he arrived at the carwash approximately 15 minutes after he left Nursery Brokers. Betty Grant and Virgil Garner, East Ridge Carwash employees, recalled the defendant arriving at the carwash at approximately 10:00 a.m. driving a purple truck. The defendant told Detective Dudley he was at the carwash for about five to ten minutes. According to the defendant's statement to Detective Dudley, he put gas in the truck and went to Capital Toyota where he stayed about 20 minutes.

5

He said he then went to Advance Auto Parts, where he spent about 30 minutes. Stephen Johns and Robert Massengale, employees of Advanced Auto Parts, recalled the defendant coming into the store that morning to pick up dune buggy parts. Johns said he offered to sell the defendant some old Volkswagen parts at a reduced price, and, after a ten to fifteen-minute discussion, the defendant purchased them as well. He did not recall the defendant's request to use the telephone. Massengale recalled giving the defendant permission to use the telephone. The defendant told Inspector Michael Mathis he tried to call home and Nursery Brokers, but got no answer. Telephone records show no phone calls were placed from Advance Auto to the Boatfield residence or Nursery Brokers. The defendant completed his purchases at Advanced Auto at 10:55.

The defendant told insurance investigator Walker he proceeded to the car dealership after he left Advanced Auto and then went to the home of Alvin Walker, Jr., who was repairing the defendant's dune buggy. According to stipulated statements by Alvin Walker, Jr. and his father, Alvin Walker, Sr., Walker, Sr. answered the door and told the defendant there had been a fire at his house. The defendant replied that Walker, Sr. should not joke about things like that. When Walker, Sr. told the defendant his wife was found inside the house, the defendant fell to the ground screaming and crying. Walker, Jr. drove the defendant to his home, where the defendant refused to get out of the vehicle and asked Walker, Jr. to take him to his mother's home.

In the defendant's statement to Detective Dudley, he stated Walker, Sr. said he was sorry to hear about his wife. The defendant said he asked Walker, Sr. what he was talking about and Walker, Sr. told him his house had caught fire and his wife had died.

Martha McNabb, the victim's mother, testified that in January or February 1998, the victim called her after awaking to a suspicious fire in her bedroom, which apparently was started by a lit candle. She said the victim suspected the defendant or their daughter, Candace Boatfield, set the fire.

Inspector Mathis testified he interviewed the defendant in a car outside the defendant's residence at approximately 11:45 a.m. on the day of the murder. Mathis said the defendant held his head down and moaned with his hands covering his face. He observed others helping the defendant walk and get in and out of the vehicle as if he could not stand on his own. Mathis stated the defendant was aware his wife was dead. Mathis explained to him the police were investigating her death. Though the defendant's hands were covering his face, his eyes were darting to look at Mathis and to look out the window of the car. Mathis also noticed that although the defendant was making crying sounds, he was not shedding any tears. The defendant made comments indicating his wife was dead, such as, "She was my best friend." After

6

Mathis ended the interview and as the defendant's sister helped the defendant out of the car, the sister told the defendant, "She's dead." The defendant responded, "I didn't know she was gone." Mathis testified he found it unusual the defendant never asked him what had happened to his wife, how she had died, or where she was.

Melody Jones, the victim's sister, testified that when the family gathered following the murder, she observed the defendant sitting down, leaning with his hands over his face, but looking at the victim's family through his fingers. She said while the defendant wailed and made noises, she did not see any tears. Jones said the defendant made inconsistent statements about his and his wife's activities on the day of the murder. She testified he initially said the victim was asleep when he left the house, but later said she was watching television and it was playing so loudly he told her to turn it down because she would not hear if anyone entered the house. The defendant told Jones he took Candace to school in his red truck. He said he later returned home, and without going in, picked up the purple truck in order to clean it. Jones also testified she did not know of any injury to the victim's hand.

The victim's father, Ray Smith, said he asked the defendant if he killed his daughter. The defendant replied that he "never laid a hand on her." Smith said the defendant became extremely nervous, began shaking, and left.

On March 13, 1998, Detective Dudley and other officers made a videotape as they walked through the house with the defendant and interviewed him. Detective Dudley testified that to his knowledge, the defendant was not told about the stab wounds to the victim's abdomen at the time the tape was made. As the officers and defendant reviewed the contents of the gun cabinet, the defendant pointed out that a knife was missing. The defendant drew a picture of the knife, showing that it had a single-edge blade.

Insurance agency employee, Gina Hembree, testified the defendant came by her office on March 18, 1998, before the agency received the fire report. When Hembree inquired as to how the fire began, the defendant told her he thought urethane on a jewelry box was ignited by a lighter or a candle. He also stated he had only been gone fifteen minutes when the fire began. On March 27, 1998, the defendant visited Hembree's office again and told Hembree police had located a witness, who was "dern [sic] near beat to death and in a coma." As the defendant made this statement, he looked Hembree "dead in the eye," giving her pause because he had also asked her if the police had spoken with her. There is nothing in the record to indicate the police ever located a witness who had been beaten.

On March 20, 1998, insurance investigator Walker interviewed the defendant. Walker questioned the defendant regarding whether he kept flammable liquids such as gasoline, kerosene, charcoal lighter fluid, or paint thinner. The defendant replied

he did not. On July 1, 1998, Walker was present when the defendant stated he kept paint thinner under the sink and an empty can of Coleman fuel in an outbuilding. The defendant told Inspector Michael Mathis that there might have been charcoal lighter fluid under the kitchen sink, and matches were kept in the kitchen drawer.

When Detective Dudley questioned the defendant regarding his financial condition, he said he was financially stable and owed nothing on his home. In May 1993, the defendant was injured while working at a foundry and lost his job. Ray Smith, the victim's father, testified he assisted the defendant in establishing the business, Nursery Brokers, so the defendant could support his family. Smith stated the business "took off" and did better than he expected. When Smith turned the business over to the defendant in January 1997, the business owed little debt. Smith described the defendant as a poor businessman. Smith testified that in November 1997, the business's checks to a supplier and for rent were returned for insufficient funds. Other proof established the defendant had difficulty paying for telephone services and insurance.

In 1997, the Boatfields obtained an equity line of credit in the amount of $44,000 secured by their home. Wayne Upchurch, the bank's branch manager, testified that "Nicy" Boatfield was very reluctant to enter into the loan agreement and wanted safeguards to ensure no funds could be withdrawn without both signatures. Mr. and Mrs. Boatfield signed a written agreement requiring both of them to sign before funds could be withdrawn on the line of credit. The Boatfields purchased credit life insurance to pay the loan in the event either of them died. As of March 12, 1998, the balance due on the line of credit was approximately $50,000. On March 20, 1998, the defendant asked to file a claim on the credit life insurance. The defendant's claim was denied because the premium payments were delinquent at the time of the victim's death, which displeased the defendant. Later, the bank began foreclosure on the house. In addition to the credit life insurance, the defendant had insurance coverage on the house and its contents. The defendant told Walker during the March 20, 1998, interview his house payments were current, and he had just learned that they had credit life insurance to pay the outstanding balance.

Shortly before the murder, the Boatfields purchased a purple truck from Capital Toyota. Edward Virgil Emerson, a finance manager at the dealership, testified he assisted them with the financing. Emerson stated the victim was vehement about having the vehicle solely in her name because she would be making the payments and was upset when she learned that the only way financing could be obtained was to include the defendant. Emerson offered them credit life and disability insurance. The defendant asked if such insurance would pay for the vehicle if something happened to either of them. Emerson advised that coverage for both of them would be more expensive. The victim did not want to pay the extra expense for joint coverage, but the defendant agreed to pay for the additional expense. The insurance would have paid the debt on the vehicle upon the victim's death.

8

The victim was employed by the Dialysis Clinic, Inc. David Hagwood, director of human resources for the Dialysis Clinic, testified the defendant would have been entitled to benefits totaling $87,700. On June 10, 1998, the defendant applied only for her retirement benefits, which were approximately $15,700.

The Boatfield family members were close friends with Lonnie and Brenda Tripp and their children. They attended the same church and had vacationed together. Brenda Tripp also worked at the Dialysis Clinic. The Tripps' sons had worked at the defendant's business. In 1997, the Tripps began having marital problems, and at the time of the murder, they were divorcing. In August 1997, the defendant and Brenda Tripp traveled to Alabama to assist the Tripps' oldest son, whose car was disabled. In the months preceding the victim's death, numerous calls were made from the defendant's cellular telephone to Brenda Tripp's pager, home, place of employment, and cellular telephone. Likewise, numerous calls were made from Brenda Tripp's cellular telephone to Nursery Brokers, the defendant's cellular telephone, his pager and his home. The phone calls continued after the victim's death. The defendant repeatedly told Inspector Michael Mathis he did not know Brenda Tripp's cellular telephone and pager numbers. Hours after Inspector Mathis interviewed Brenda Tripp on March 27, calls were placed between the defendant and Brenda Tripp.

The defendant was openly involved in a romantic relationship with Brenda Tripp after the victim's death. Inspector Michael Mathis testified that in June 1998, police intercepted telephone calls between the defendant and Brenda Tripp in which it was apparent they were physically intimate. The state presented a tape recording of a conversation between the defendant and Tripp from June 19, 1998, indicating the two were having sexual relations. In February 1999, the defendant sent a letter to Lonnie Tripp claiming he was not involved with Brenda Tripp before the Tripps' separation, but apologized to Tripp for betraying his friendship. In the letter, the defendant also stated he had prayed for God and the victim to forgive him.

Melody Jones, the victim's sister, testified the Boatfields had marital problems for years. Jones stated the victim suspected the defendant was having an affair with Brenda Tripp.

The defense presented the testimony of Candace Boatfield and Eddie Boatfield, the defendant's brother, who testified the victim's hand appeared swollen after her death. Eddie Boatfield testified the defendant screamed and cried hysterically after his wife's death. Officers also testified the defendant cooperated in the investigation by giving fingerprints, blood samples, interviews, and was willing to take a polygraph. Terry D. Traylor testified the defendant was not able to do lifting. The defense submitted medical records showing the defendant had undergone four surgeries on his cervical spine since his injury at work in 1993.

9

Tommy McMillin testified during cross-examination that when he saw the defendant at Nursery Brokers on the morning of the murder, there was no blood on the defendant's jacket; the defendant did not smell like gasoline; he did not appear to have been in a struggle; and he was behaving normally. The defendant's brothers testified for the defense that they found footprints approximately 100 feet behind the house at the back of the yard near the woods.

Candace Boatfield testified her mother knew the defendant went with Brenda Tripp to Alabama to assist Durand Tripp and was not upset. Candace Boatfield and Sharon Beaver testified Brenda Tripp and the victim slept in the same bed during a church trip to Gatlinburg two weeks before the murder. Witnesses testified the defendant's cellular telephone was used by many people, including Brenda Tripp's sons, who worked at Nursery Brokers.

Sabrina McMillin, the defendant's daughter from a prior marriage, testified for the defense that she listened to the tapes of the phone calls intercepted by the police from her father's and Brenda Tripp's phones and prepared a summary showing most of the phone calls were not between the defendant and Tripp. McMillin said she was never aware of any romantic relationship between Brenda Tripp and her father prior to the victim's death. Lonnie Tripp testified he did not accuse the defendant of being involved with his wife prior to the victim's death.

Candace Boatfield testified her parents continued to live together after the incident in which her mother found a candle burning by her bed, and her parents did not have any major arguments. She stated her mother joked about the candle incident. Officer Charles Russell testified he took a statement from the victim's mother, Martha McNabb, who said the victim did not name either the defendant or Candace Boatfield as a suspect who lit the candle in her bedroom.

John Hilhoit, administrator of the Dialysis Clinic, testified the victim earned over $28,000 in 1997 and over $26,000 in 1996. He confirmed the victim was being considered for a promotion at the time of her death.

Based on this evidence, the jury found the defendant guilty of premeditated first degree murder and abuse of a corpse.

*State v. Boatfield*, 2001 WL 1635447, *1 -7 (Tenn. Crim. App. 2001)

## IV.  Analysis

Boatfield raises two claims in this habeas petition. First he claims his due process rights were violated when the State withdrew its plea agreement and second he argues his fourth

amendment rights were violated when the state used wiretap evidence that was unlawfully intercepted.

*A.    Denial of Specific Performance of Immunity Agreement Claim.*

Boatfield maintains a plea agreement was reached between the state and defense counsel that he would plead guilty to one count of voluntary manslaughter and serve a five-year sentence with credit for time served. Although the victim's family initially told the state it was satisfied with the agreement, upon learning Petitioner would probably be placed on community corrections the family objected to the agreement. The trial court had indicated it would accept such a plea agreement if all the parties agreed. Pursuant to the objection by the victim's family, the plea was withdrawn. Petitioner moved the trial court to specifically enforce the plea agreement, and the trial court denied the motion.

The record reflects that on April 17, 2000, following a suppression hearing, Mr. Denny, the prosecutor, and Mr. Summers, defense counsel, discussed a potential plea agreement in which the defendant would plead guilty to voluntary manslaughter for a five-year sentence with credit for time served; Petitioner had served almost two years. Mr. Denny reviewed the agreement with members of the victim's family, and they were satisfied with the agreement. The following day both counsel approached the trial judge to advise her of the potential agreement. The trial judge indicated her "acceptance of it upon the victim's family members being satisfied with it[.]" (Addendum No. 10, Vol. XII, p. 19). Defense counsel was interested in finding a means by which the defendant could avoid being sent to the Department of Corrections for classification and instead be eligible for prompt release. At the suggestion of the judge, the attorneys conferred with the coordinator for the felony community corrections program regarding Petitioner's eligibility for alternative sentencing

11

under that program and awaited his response. *State v. Boatfield*, 2001 WL 1635447, *7 (Tenn. Crim. App. 2001).

Petitioner informed defense counsel that he found the proposed agreement acceptable and defense counsel advised the State of Petitioner's acceptance. A plea hearing was scheduled for the next day but later that day, Mr. Denny was informed the victim's family objected to the plea agreement. The next day at the scheduled time for the plea hearing, Mr. Summers, who was in possession of a petition to enter plea of guilty and waiver of trial by jury signed by Mr. Summers but not signed by Petitioner, was advised by Mr. Denny that the plea was being withdrawn due to the family's objection. When defense counsel sought to have the trial court specifically enforce the plea agreement, the trial judge denied the motion, finding that although she had indicated her acceptance of it during their private meeting, she had not yet accepted the plea when it was withdrawn.

The appellate court analyzed Tennessee law which provides that if the state elects to make a plea offer, such offer is revocable until it is accepted by the trial court and that the plea agreement is not enforceable by either party until it is accepted by the trial court. *See State v. Boatfield*, 2001 WL 1635447, at *8. Based on the Tennessee law and the facts of this case, the appellate court resolved the issue as follows:

> In the case sub judice, it is clear that while the trial court was tentatively satisfied with the plea agreement, it had not yet been "accepted" by the trial court. There was never a hearing in open court during which the defendant entered a formal plea of guilty pursuant to the proposed plea agreement. Therefore, the state remained at liberty to withdraw the offer it had previously made, despite the defendant's expressions of willingness to enter a guilty plea pursuant to the plea offer. The state's revocation based on the family's objection to the proposed plea agreement was within its discretion. Regardless, it was within the trial court's discretion to reject the proposed plea, which it indicated it would do absent the agreement of the victim's family.

12

*State v. Boatfield*, 2001 WL 1635447, *8 (Tenn.Crim.App. 2001). The appellate court concluding the issue was meritless, noted that the defendant did not give up any of the rights in consideration of the offer made by the state and that the trial judge did not abuse her discretion in failing to accept the plea agreement that had been "permissibly revoked" by the state. *Id.* at *9.

The issue before this Court is whether a defendant's mere acceptance of a prosecutor's proposed plea bargain creates a due process right to have the bargain specifically enforced. The Supreme Court has instructed that no such due process right exists. *Mabry v. Johnson*, 467 U.S. 504, 507 (1984). Thus, simply put, the Supreme Court's holding in *Mabry* forecloses Petitioner's argument.

In *Mabry* the prosecutor proposed a guilty plea to a charge of accessory after a felony murder in exchange for a recommendation of a 21-year sentence to be served concurrently with other charges. When defense counsel called the prosecutor three days later and communicated respondent's acceptance of the offer, the prosecutor informed counsel that a mistake had been made and withdrew the offer but offered the alternate proposal of a 21-year consecutive sentence. The new offer was rejected and the defendant proceeded to trial. After a mistrial was declared, the defendant accepted the alternate proposal but pursued post-conviction remedies with respect to his guilty plea. The federal district court dismissed the petition holding the defendant had understood the consequences of his guilty plea. The court further held that counsel was effective because it was not established that defendant had detrimentally relied on the prosecutor's first proposed plea agreement, thus, he had no right to enforce it. The Court of Appeals reversed holding that fairness precluded the prosecution's withdrawal of the plea proposal once it was accepted by the defendant. *Id.* However, it appears that the Supreme Court established a bright line rule in *Mabry* when it

13

reversed the Court of Appeals and held: "A plea bargain standing alone is without constitutional significance;

in itself it is a mere executory agreement which, until embodied in the judgement of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Id.* at 507.

Thus, the *Mabry* holding controls the disposition of this claim and *Mabry* instructs that Petitioner's acceptance of the plea offer did not give him a due process right to have the plea bargain specifically enforced. In conclusion, on the basis of *Mabry*, the Court finds that a legal error was not committed when the state court permitted the state to revoke the plea offer and proceed to trial prior to acceptance of the plea agreement by the trial court. A breached plea offer without more is insufficient ground for the granting of habeas corpus relief.

Furthermore, even assuming *arguendo* that the withdrawal of the plea offer implicated Petitioner's constitutional rights, under the AEDPA standard of review, this Court may not grant habeas relief on a claim that was adjudicated on the merits in state court unless the state court's decision was contrary to, or involved an unreasonable application of clearly established Federal law. Here, the Tennessee Court of Appeals—relying on state court precedent—denied Petitioner's direct appeal, explaining that a plea offer is revocable until accepted by the trial court. *State v. Boatfield*, 200 WL 1635447, at *8. This conclusion was not contrary to, or an unreasonable application of Supreme Court precedent. Indeed, the Court of Criminal Appeals of Tennessee's decision comports with the Supreme Court's holding in *Mabry*.

In sum, the claim that the withdrawal of the plea agreement violated Petitioner's due process rights lacks merit and will be **DISMISSED**.

14

*2.    Unlawful Interception of Wiretap Evidence*

Petitioner contends the state failed to comply with the Wiretapping and Electronic Surveillance Act of 1994, Tenn. Code Ann. §§ 40-6-301 *et. seq.*, and that the communications obtained by law enforcement through the electronic interception of his telephone calls should have been suppressed as they were unlawfully intercepted in violation of the Fourth Amendment because state authorities did not properly comply with the reporting requirements.    It is important to note at the outset that Petitioner is not claiming the government did not properly apply for an order authorizing or approving the interception of an oral communication or that the court order authorizing protected communications was not based on proper statutory authorization.  Rather, Petitioner is complaining that the evidence should have been suppressed because law enforcement, the judge, and the attorney general  failed to comply with the reporting requirements of Tenn. Code Ann. § 40-6-308(a) and (c).

Respondent argues Petitioner failed to raise this claim in state court as a federal constitutional deprivation.  According to Respondent, the state brief filed on Petitioner's behalf focused on state law and the Tennessee Court of Criminal Appeals relied on state law to resolve the issue.  In the alternative, Respondent contends the state appellate court correctly concluded that failure by the issuing judge and the state attorney general to make administrative reports was not sanctionable by suppression.

Congress enacted the Wiretap Act, in large part, to create procedures for electronic surveillance by government officers that comply with the requirements of the Fourth Amendment as articulated by the Supreme Court. *See United States v. United States District Court*, 407 U.S. 297, 302 (1972). The Tennessee Wiretapping and Electronic Surveillance Act of 1994, codified as

Tenn. Code Ann. §§ 40-6-301 *et. seq.*, parallels the Federal Wiretap Act and similarly prohibits the unauthorized interception and disclosure of oral communications. However, the Tennessee statute is more specific and restrictive in terms of certain reporting requirements. Tenn. Code Ann. § 40-6-308(a) requires the judge to report to the attorney general within thirty days after the expiration of an order or after each extension of an order entered under § 40-6-304; § 40-6-308(b) requires the attorney general and reporter to make a report in January of each year to the administrative office of the United States courts, the speaker of the senate, and the speaker of the house of representatives; and § 40-6-308(c) requires the order authorizing interception to require that reports be made to the judge showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Reports are to be made at ten-day intervals, with the first report required on the tenth day after the order is entered.

On June 12, 1998, Hamilton County Criminal Court Judge Stephen M. Bevil signed three orders authorizing the interception of calls from the defendant's cellular and business telephones as well as from Brenda Tripp's cellular phone for a period of thirty days. Interception began on June 17 and ended on June 25. Michael Mathis of the Chattanooga Police Department gave Judge Bevil verbal updates regarding the progress of the interceptions and provided him with a written report on June 22. *State v. Boatfield*, E2000-01500-CCA-R3-CD, 2001 WL 1635447, at *12 (Tenn.Crim.App. Dec. 20, 2002). There is no evidence that Judge Bevil or the attorney general filed their required reports (Addendum No. 2, Vols. 13 & 18).

The state appellate court concluded that Michael Mathis' June 22, 1998, report to Judge Bevil complied with the reporting requirements of Tenn. Code Ann. § 40-6-308. Since the interceptions were completed on June 25th the state court concluded no other reports were

16

necessary. Additionally, the state discontinued the interceptions well before the expiration of the 30-day period allowed by the order. The state court observed that the Wiretapping and Electronic Surveillance Act of 1994 does provide for suppression as a remedy if the interception is unlawful; the order of authorization was insufficient on its face; the interception was not made in conformity with the order of authorization; if the disclosure violated the act; or if the interception was illegal. Tenn. Code Ann. § 40-6-304(h)(1). However, the appellate court concluded that failure of the issuing judge to report to the state attorney general and the failure of the state attorney general to report to the federal courts and the legislature was not included as a violation sanctionable by suppression, thus the evidence obtained by the state through electronic interception was admissible into evidence. *State v. Boatfield*, 2001 WL 1635447, at *13.     Petitioner is attacking the state court's interpretation of a Tennessee Statute. The Supreme Court of the United States has emphasized that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[;] . . . federal habeas corpus relief does not lie for errors of state law[; and] . . . [i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Accordingly, a writ of habeas corpus is unavailable for alleged errors in the interpretation or application of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Petitioner has not demonstrated that the state court's interpretation was unreasonable, he simply urges a different interpretation of the statute. Moreover, Petitioner has not demonstrated that the state court's interpretation of its law and conclusion that suppression was not the remedy for failure to comply with the reporting requirements of the wiretap statute violated his constitutional

rights. There is nothing before the Court that indicates that the statutory suppression procedures in the Tennessee code were intended to reach violations of reporting procedures.

Although the Court's research has not revealed a Supreme Court case addressing non-compliance of the reporting requirements of the wiretap statute, it has found Second and Seventh Circuit law indicating that suppression of the wiretap evidence is not the automatic remedy for failure to properly comply with a court's progress report order. *See United States v. Breland*, 356 F.3d 787, 794 (7th Cir. 2004) ("Because the district court was satisfied that the government sufficiently complied with its order, we cannot say it was an abuse of discretion for the court to deny defendants' motion to suppress the wiretap evidence."); *see also United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir. 1977) ("While these reports should have been timely filed, the sanction for failure to do so is surely not automatic suppression of the tapes.").

The United States Supreme Court has instructed that not every failure to comply fully with the requirements provided in the wiretap statute renders the interception of wire or oral communications unlawful. *United States v. Chavez*, 416 U.S. 562, 574-75 (1974). The Supreme Court has explained that:

> [W]e think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device. We have already determined that Congress intended not only to limit resort to wiretapping to certain crimes and situations where probable cause is present but also to condition the use of intercept procedures upon the judgment of a senior official in the Department of Justice that the situation is one of those warranting their use.

*United States v. Giordano*, 416 U.S. 505, 527 (1974).


Petitioner does not claim the government did not properly apply for an order authorizing or

approving the interception of an oral communication or that the court order authorizing the preservation, retention, and continued recording of protected communications was not based on proper statutory authorization.[1] Rather, he claims non-compliance with the statutory reporting procedures warrants suppression of the evidence. The evidence reflects the state complied with the procedures set forth in Tenn. Code Ann. § 39-13-604 in making the application before Judge Bevil, and the order authorizing the interception and preservation and retention of such recording was properly issued. To the extent the purpose of the statute is designed to protect privacy interests similar to those reflected in the Fourth Amendment, that statutory purpose was not violated by the failure to comply with the reporting requirements. It does not appear the reporting requirements in the Tennessee statute directly and substantially implement the congressional intention to limit the use of intercept procedures. "The drastic remedy of suppression is not required where a technical violation occurs and the general purpose of the statute has been preserved." *See United States v. Lawson*, 545 F.2d 557, 562 (7th Cir. 1975), *cert. denied*, 424 U.S. 927 (1976). To be rendered unlawful, Petitioner must demonstrate a substantial deviation from the requirements of the statute. *Id.* Petitioner has failed to make such a showing.

Since State courts are the ultimate interpreters of their own state's laws, and federal courts entertaining petitions for writs of habeas corpus are bound by the construction placed on a state's statute by the courts of that state and since Petitioner has not demonstrated he was deprived of any federally-protected right by the failure to comply with the state reporting requirements of their wiretap law, habeas relief is not warranted. Petitioner's challenge to the interpretation and

_____

[1]     Although he made such a claim in the state courts, the state courts found the claim to be without merit and nothing before this Court indicates the state court decisions on those claims were unreasonable or contrary to Supreme Court precedent.

application of state law does not rise to the level of a constitutional violation; thus, he has failed to present a cognizable claim for purposes of federal habeas relief. Consequently, Petitioner has not demonstrated the state appellate court's resolution of this claim was based on an unreasonable interpretation of the facts or was the result of an unreasonable application or contrary to Federal law. Petitioner has not identified, nor is the Court aware of, any Supreme Court precedent directing that suppression of wiretap evidence is the remedy for failing to comply with the reporting requirements. Accordingly, this claim will be **DISMISSED**.

V.    **CONCLUSION**

Having considered both parties' pleadings together with the state court record, for the above reasons, the Court finds no basis on which to grant the writ of habeas and, therefore, will **GRANT** Respondent's motion for judgment as a matter of law (Court File No. 9)and **DISMISS** the habeas petition (Court File No. 1).

An appropriate judgment will enter.


/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

20